UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHICO S.S. MOSS, et al.,

     Plaintiffs,

v.                                  CASE NO. 8:18-cv-587-T-23JSS

AMERICAN PRIVATE
EQUITY, LLC, et al.,

     Defendants.

_____/

## ORDER

Chico S.S. Moss, a partner of The Prosyon Group, sues (Doc. 1) American Private Equity, also known as American Family Legacy Group (AFLG), and Freddy Russian, AFLG's president and CEO. Count I alleges breach of contract, and Count II alleges "fraudulent inducement." The defendants move (Doc. 34) for summary judgment on Count II. The plaintiffs respond. (Doc. 39)

### BACKGROUND

Moss is an American citizen who resides in São Paulo, Brazil. Moss has about a decade of experience working in investment banking and financial advising and holds a Master of Business Administration degree from The Wharton School at the University of Pennsylvania. In Brazil, one of Moss's professional specialities is serving as a "country manager." Moss uses his contacts in, and experience with,

Brazil to guide American companies and investors through business deals —
particularly mergers and acquisitions — with Brazilian companies and investors.

AFLG is an asset management firm in Tampa, Florida. In 2014, Quimatec,
a Brazilian chemical company, hired AFLG to help sell Quimatec. After more than
a year of unsuccessful efforts by AFLG to sell Quimatec, Miguel Alban, AFLG's
vice-president, discovered Moss and Prosyon. The parties agree that AFLG engaged
Moss's assistance to sell Quimatec, but the parties dispute the terms of the
engagement.

Over several weeks, Alban and Moss negotiated an arrangement between
Moss and Prosyon on one hand and AFLG on the other. On June 3, 2015, Alban
emailed Moss that "we will send agreement shortly. We will do [2.5%] for any
amount raised. No ladder." (Doc. 39-1 at 56) The next day, Russian sent Moss a
letter (Doc. 1-1) on AFLG stationery:

> Our compensation to The Prosyon Group services will follow the
> structure described below:
>
> I) Retainer Fee: Waived
> ii) Out-of-Pocket expenses: Waived
> iii) Success fee: AFLG Investments will pay The Prosyon
> Group two and a half percent (2.5%) of the amount invested
> by a third party in any of the Products sold by AFLG
> investments.
> (iv) Amount Invested should be understood as the value in form
> of cash, securities or other assets contributed directly or
> indirectly by The Prosyon Group's investors in the
> Products. Success fee payments shall be paid within ten (10)
> days after the investment of The Prosyon's investor in the
> Products.

Accepted by:

Freddy Russian
President & CEO
American Private Equity, LLC

A signature appears between "Accepted by:" and "Freddy Russian." According to Moss, Quimatec was AFLG's "product." (Doc. 33-1 at 99–100)[1]

Moss's efforts resulted in another Brazilian company's purchasing Quimatec. (Doc. 34 at 2) Shortly before the closing, Moss emailed Russian to confirm how much AFLG and Prosyon stood to earn from the sale. (Doc. 33-2 at 34–35; Doc. 39-1 at 111–13) Russian responded to Moss, "You are getting 2.5%." (Doc. 39-1 at 111) But five hours later, Russian emailed Moss stating, "since the price . . . is lower . . . [y]ou are getting 45% of what we getting. Sorry for the confusion this is one of the many deals that we are doing together." (Doc. 39-1 at 110) Moss believed that the change constituted a "breach of contract." (Doc. 33-2 at 36–39)

A month later, Russian and Moss met in São Paulo to discuss Moss and Prosyon's compensation for the Quimatec sale. According to Moss, Russian stated that "[Moss and Russian] have no contract" and that "[Russian did not] have to pay anything." (Doc. 33-2 at 40–41) Two weeks after the meeting, Moss and Russian executed a "Release Letter," which states that "Russian, as CEO and President of

---

[1] In this order, page citations refer to the page number in the banner atop each page, not to the deposition page number.

AFLG Investments, agrees to pay and Moss, as partner of Prosyon, agrees to accept 40% of the transaction fee paid by [Quimatec] to AFLG Investments as a performance based compensation for consulting services." (Doc. 1-4 at 1) In other words, Moss "agree[d] to accept" 40% of AFLG's fee from Quimatec rather than 2.5% of the entire purchase price. As a result, Moss contends that he forfeited about $458,000. (Doc. 33-2 at 43)

Additionally, the Release Letter states that "AFLG will contract Prosyon as Firm Advisor under a separate Firm Advisory Agreement that will be mutually agreed upon . . . . The advisory fee payment will be US$ 50,000 net per annum for three years based on performance. The terms under which performance will be evaluated is also to be mutually agreed . . . ." (Doc. 1-4 at 2) Moss and Russian agree that the parties intended the "advisory fee payment," $150,000 over three years, to mitigate the "shortfall" resulting from Moss's accepting 40% of AFLG's transaction fee rather than 2.5% of Quimatec's purchase price. (Doc. 33-2 at 63, 70, 72; Doc. 39-1 at 32)

Three months after executing the Release Letter, Moss and Russian executed a "Contractor's Agreement," which states:

> To compensate for a shortfall in previous service agreement, [Moss] will receive $50,000 a year subject to the achievement of the following goals:
>
> > a. [Moss] will help [AFLG] to engage in one or more consulting agreements that bring an income of $200,000 during the twelve months after the signing date.

b. [Moss] will contribute to [AFLG]'s effort in raising capital
for customers. The goal to be set is $20,000,000 during the
twelve months after the signing date.

(Doc. 1-5 at 2)  But after paying Moss about $28,000 during the next seven months,
AFLG stopped paying Moss.  According to Russian, AFLG terminated the
Contractor's Agreement because Moss failed to perform.  (Doc. 39-1 at 34–35)
Moss contends that he could not perform because AFLG disregarded or obstructed
investment ideas that Moss proposed in his effort to meet the Contractor's
Agreement's benchmarks.  (Doc. 33-2 at 72–78)

Moss alleges that Russian, never intending to pay Moss $150,000 for his
services, offered Moss $150,000 to induce Moss to forgo the fee for which Moss and
AFLG had bargained originally (*i.e.*, the 2.5% of Quimatec's total purchase).  (Doc. 1
at ¶¶ 47, 48, 51; Doc. 39 at 13)  Russian's alleged fraud purportedly cost Moss more
than $458,000.  (Doc. 33-2 at 43)

## DISCUSSION

Count II fails to specify whether Russian fraudulently induced Moss to agree
to the Release Letter, to the Contractor's Agreement, or to both.  (Doc. 1 at ¶¶ 44–50)
The distinction is consequential because the Release Letter contains a Delaware
choice-of-law clause (Doc. 1-4 at 3), but the Contractor's Agreement contains a
Florida choice-of-law clause. (Doc. 1-5 at 2)

The Release Letter's choice-of-law clause states that Delaware law controls
"any and all disputes arising out [of] or relating to the subject matter of the agreement

. . . ." (Doc. 1-4 at 3)  A choice-of-law clause that applies to "all disputes . . . relating to" a contract is "broad" and can govern a tort claim based on performance under the contract. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009); *Connectus LLC v. Ampush Media, Inc.*, No. 8:15-cv-2778-T-33JSS, 2017 WL 275944, at *6 (M.D. Fla. Jan. 20, 2017) (Covington, J.) (concluding that a choice-of-law clause that applied to "all matters relating" to the parties' contract was "broad" and governed a tort claim related to performance under the contract); *Simpson v. FWM Labs.*, No. 09-61771-CIV, 2010 WL 1257714, at *3 (S.D. Fla. Mar. 29, 2010) (Cohn, J.) (concluding that a choice-of-law clause that applied to "all matters arising out of or otherwise relating to" the parties' contract was "broad" and governed a tort claim related to the contract); *Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*, No. 1:06-CV-261-JEC, 2008 WL 11335004, at *9 (N.D. Ga. Sept. 22, 2008) (Carnes, J.) (concluding that a choice-of-law clause that applied to "all issues hereunder" was "broad" and governed a tort claim relating to performance under the contract). Accordingly, Delaware law controls a claim that Russian fraudulently induced Moss to agree to the Release Letter.

By contrast, the Contractor's Agreement contains a choice-of-law clause stating that the Contractor's "Agreement is governed by the internal laws of the State of Florida . . . ." (Doc. 1-5 at 2)  The clause is "narrow" and does not control a tort claim. *Green Leaf Nursery v. E.I. Dupont de Nemours & Co.*, 341 F.3d 1293, 1300–01 (11th Cir. 2008) (holding that a choice-of-law clause stating that the contract "shall be

governed and construed in accordance with the laws of the State of Delaware" was "narrow" and not intended to govern a tort claim even if related to performance under the contract).  Nevertheless, Florida's choice-of-law rules dictate that Florida law controls a claim that Russian fraudulently induced Moss to agree to the Contractor's Agreement.[2]

Under Delaware law, a plaintiff claiming fraud in the inducement must show (1) a false representation of material fact, (2) the defendant's knowledge of the representation's falsity or reckless indifference to the truth about the representation, (3) the defendant's intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction taken in justifiable reliance on the representation, and (5) an injury to the plaintiff because of the reliance.  *El v. Davis*, No. 12-1580-GMS,

---

[2] A federal court exercising diversity jurisdiction applies the choice-of-law rules of the forum state. *Grupo Televisa, S.A. v. Telemunod Commc'ns Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Florida uses the "most significant relationship" test to determine which jurisdiction's law applies to a tort claim. *Grupo Televisa*, 485 F.3d at 1240. Under Section 145, Restatement (Second) of Conflict of Laws, the "most significant relationship" accounts for "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicile, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." *Grupo Televisa*, 485 F.3d at 1240; *Bishop v. Fla. Speciality Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980). Moss suffered the injury in Brazil, his domicile. Moss's company, Prosyon, is a Brazilian company. Although the alleged tort occurred mainly through email between Florida and Brazil, Moss and Russian's meeting in São Paulo factors into the injury. And the agreement among Moss, Prosyon, Russian, and AFLG centered on completing in Brazil a business deal between two Brazilian companies.

Although Brazil has the "most significant relationship" to the alleged tort, no party presents or argues Brazilian law. A comment to Section 136, Restatement (Second) of Conflict of Laws, explains that if "both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum" and the "[t]he forum will usually decide the case in accordance with [the forum's] own local law . . . ." *Cavic v. Grand Bahama Development Co.*, 701 F.2d 879, 882 (11th Cir. 1983); *Continental Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1331 n.17 (M.D. Fla. 2007) (Schlesinger, J.).

2013 WL 1914233, at *2 (D. Del. May 7, 2013) (Sleet, J.) (citing *Stephenson v. Capano Dev. Co.*, 462 A.2d 1069, 1073 (Del. 1983)).  A promise can constitute a false representation of material fact if the promisor lacked an intent to perform the promise.  *Murphy v. T.B. O'Toole, Inc.*, 87 A.2d 637, 638 (Del. Super. 1952).[3]

Under Florida law, a plaintiff claiming fraud in the inducement must show (1) a false statement about a material fact, (2) the defendant's knowledge of the statement's falsity, (3) the defendant's intention to induce the plaintiff's reliance, and (4) the plaintiff's reliance on the false statement to the plaintiff's injury. *PVC Windoors, Inc. v. Babbitbay Beach Construction, N.V.*, 598 F.3d 802, 808–09 (11th Cir. 2010); *Tindall v. Gibbons*, 156 F. Supp. 2d 1292, 1298 (M.D. Fla. 2001) (Moody, J.).  A promise can constitute a false statement about a material fact if "made without any intention of performing or made with the positive intention not to perform." *Wadlington v. Continental Med. Servs., Inc.*, 907 So.2d 631, 632 (Fla. 4th DCA 2005).

Frequently, determining what specifically a defendant falsely stated or misrepresented and what a defendant intended when issuing the false statement or misrepresentation requires inferences based on circumstantial evidence.  This action

---

[3] *See also Grunstein v. Silva*, No. 3932-VCN, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) ("statements of intention . . . which do not, when made, represent one's state of mind are misrepresentations known to be such and are fraudulent") (quotations and citations omitted); *Hanna Sys., Inc. v. Capano Group, L.P.*, No. 7408, 1985 WL 21119, at *2 (Del. Ch. Apr. 16, 1985) (explaining that a plaintiff suing for fraud in the inducement must show that the "promisor did not intend to comply with the promise when made").

is no exception.  Because factual disputes exist about Russian's statement to Moss, the statement's veracity, and Russian's intent when issuing the statement, a "genuine dispute as to [a] material fact" remains, and the defendants' motion for summary judgment (Doc. 34) is **DENIED**.  The defendants' motion for leave to file a reply (Doc. 40) is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on May 15, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE